UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | **MEMORANDUM & ORDER** |
|---|---|
| | **23-CR-186 (NGG)** |

-against-

JOHN MONTANEZ,

Defendant.

NICHOLAS G. GARAUFIS, United States District Judge.

On April 26, 2023, a federal grand jury sitting in Brooklyn indicted Defendant John Montanez for possession of one Hornady .357 caliber cartridge as a felon, in violation of 18 U.S.C. § 922(g)(1). (Indictment (Dkt. 1).) Mr. Montanez now moves to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(1) and to suppress the physical evidence and his post-arrest statements under Rule 12(b)(3)(C). (Mot. to Suppress Physical Evid. & Mot. to Dismiss ("First Mot.") (Dkt. 20-1); Mot. to Suppress Statements ("Second Mot.") (Dkt. 25-1).) For the reasons that follow, Mr. Montanez's motions are DENIED.

## I.   BACKGROUND

### A.   Search of Mr. Montanez's Apartment

On February 17, 2022, United Parcel Service ("UPS") personnel intercepted a suspicious package addressed to "Lily Gonzalez, Fl 2, 731 New Jersey Avenue, Brooklyn, NY 11207-7011." (First Mot. at 2.) Upon inspection, UPS determined that the package contained firearm components: two completed lower receivers, two slides, and two magazines. (*Id.*) UPS then contacted the New York City Police Department ("NYPD"). (*Id.* at 2-3.)

NYPD Detective Jose Castano took possession of the package and was able to assemble the firearm components to create an operable firearm. (First Search Warrant Application (Dkt. 20-2, ECF

1

7-11) ¶ 12; Gov. Opp. to First Mot. ("First Gov. Opp.") (Dkt. 21) at 2.) Detective Castano searched for the intended recipient and address in a law enforcement database and found no connection between Lily Gonzalez and 731 New Jersey Avenue; the search indicated that Mr. Montanez lived at the address since February 2020. (First Search Warrant Application ¶¶ 9-10; First Gov. Opp. at 3.) Detective Castano then determined that Mr. Montanez had been convicted of manslaughter in New York in 2006 and that he was on parole for the same offense until December 2022. (First Search Warrant Application ¶ 17; First Gov. Opp. at 3.)

The following day, on February 18, 2022, the NYPD and the Kings County District Attorney's Office applied for an anticipatory no-knock search warrant for Mr. Montanez's apartment. (*See* First Search Warrant Application.) Kings County Supreme Court Justice Guy J. Mangano, Jr. issued the warrant the same day. (*See* First Search Warrant (Dkt. 20-2, ECF 12).) Later that day, the NYPD and Kings County District Attorney's Office amended their search warrant application, noting that the firearm components in the package were modified so as to make them inoperable. (*See* Second Search Warrant Application (Dkt. 20-2, ECF 1-4).) Kings County Supreme Court Justice Jean T. Walsh issued the second search warrant in the evening of February 18, 2022. (Second Search Warrant (Dkt. 20-2, ECF 5).)

The search warrant stated that there was probable cause to believe that there were firearm components at 731 New Jersey Avenue, Floor 2. (*Id.*) The application to search Mr. Montanez's apartment was granted on the condition that: "an individual (who appears to be over the age of 18) who states that he or she is the intended recipient [of] the subject package or the rightful owner thereof" then "enter[s] into the subject location after acceptance of the package." (*Id.*)

On the morning of February 21, 2022, Detective Castano, posing as a UPS delivery person, rang the doorbell to Mr. Montanez's

apartment at 731 New Jersey Avenue and said that he had a package. (Affidavit of Jose Castano ("Castano Aff.") (Dkt. 21-1) ¶¶ 2-3.) In dueling affidavits, Mr. Montanez and Detective Castano disputed the facts of the delivery, in particular whether Detective Castano asked Mr. Montanez if Lily Gonzalez lived in the apartment and if Mr. Montanez was authorized and willing to accept the package on Ms. Gonzalez's behalf. (*Compare* Castano Aff. ¶¶ 5-7 *with* Affidavit of John Montanez ("Montanez Aff.") (Dkt. 24-2) ¶¶ 8-10.) But the parties do not dispute that Mr. Montanez took the package and returned to his apartment. (Castano Aff. ¶ 7; Montanez Aff. ¶ 11.) Shortly thereafter, law enforcement officers searched Mr. Montanez's apartment, finding the firearm components and a Hornady .357 caliber cartridge. (First Gov. Opp. at 4.)

### B.   Post-Arrest Interrogation

On February 21, 2022 at 3:30 p.m., Special Agent Joshua Urban and Detective Rob Negron conducted a post-arrest interview of Mr. Montanez. (*See* Transcript of Post Arrest Interview ("Post Arrest Interview Tr.") at 1.) After Mr. Montanez stated that he was not interested in speaking with the agents, Special Agent Urban read Mr. Montanez his *Miranda* rights. (*Id.*) Special Agent Urban then asked Mr. Montanez to initial and sign a waiver of his rights, including the right to remain silent or have an attorney present during questioning. (*Id.* at 1-2; Rights Waiver (Dkt. 27-1).)

The agents proceeded to interrogate Mr. Montanez on his understanding of the package's contents, his knowledge of prior deliveries to his residence, and his experience with the criminal justice system. (Post Arrest Interview Tr. at 2-7). Following approximately six minutes of questioning, Mr. Montanez requested an attorney. (*Id.* at 6; *see also* Post Arrest Interview Recording at 2:48-8:47.) After one of the agents asked to look through his phone, Montanez stated: "I'd rather just—don't even know what the procedures are for this type of thing. I'd rather just speak with

3

an attorney honestly . . . I'd rather just exercise my right to speak to my family. And I have money for an attorney, so I'd rather just speak to an attorney, respectfully." (Post Arrest Interview Tr. at 7.) Special Agent Urban then re-advised Mr. Montanez of his *Miranda* rights. (*Id.* at 7-8.) After attempting to persuade Mr. Montanez to continue to speak for about four minutes, the law enforcement officers stopped the interrogation. (*Id.* at 7-9.)

## II.  DISCUSSION

Mr. Montanez moves for three forms of relief: (1) to dismiss the indictment for criminalizing conduct that is protected under the Second Amendment; (2) to suppress the physical evidence as the fruit of an unreasonable search in violation of his Fourth Amendment rights; and (3) to suppress Mr. Montanez's post-arrest statements as made in violation of his Fifth and Sixth Amendment rights. The court addresses each in turn.

### A.   Motion to Dismiss under the Second Amendment

Mr. Montanez was indicted for violating 18 U.S.C. § 922(g)(1) for his possession of ammunition as a convicted felon. (Indictment ¶ 1.) Mr. Montanez moves to dismiss the indictment on the grounds that the Second Amendment protected his conduct. (First Mot. at 6-9.)

#### 1.   Applicable Law

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *District of Columbia v. Heller*, the Supreme Court interpreted the Second Amendment to confer "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008).[1] In *New York State Rifle & Pistol Ass'n v. Bruen*, the Court provided the framework

---

[1] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

for determining whether a firearm regulation violates the Second Amendment: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. 1, 24 (2022). The Court recently applied the *Bruen* framework in *United States v. Rahimi* and rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(8), which criminalizes possession of a firearm for a person who is subject to a domestic violence restraining order. *See generally United States v. Rahimi*, No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024). The Court clarified that *Bruen* does not require a "historical twin" and that "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at *6. Thus, the right to bear arms is "not unlimited." *Heller*, 554 U.S. at 595; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (reaffirming that *Heller* did not invalidate felon-in-possession laws); *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (same); *id.* at 72 (Alito, J., concurring) (same).

   2. Discussion

Following the Supreme Court's decisions in *Heller* and *McDonald* but before the Court's decision in *Bruen*, the Second Circuit held that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013). Because the Second Circuit directly affirmed the constitutionality of 18 U.S.C. § 922(g)(1), Mr. Montanez's challenge to the indictment fails. This court is bound by Second Circuit precedent. *See Monsanto v. United States*, 348 F.3d 345, 351 (2d Cir. 2003). District courts in the Second Circuit have held that a district court must follow binding circuit precedent unless "a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled

by the Second Circuit." *United States v. Dupree*, No. 16-CR-84 (ARR), 2016 WL 10703796, at *4 (E.D.N.Y. Aug. 29, 2016). It is not "inevitable" that the Second Circuit will overrule *Bogle*—sister circuits have upheld the constitutionality of § 922(g)(1) after *Bruen*. *See United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024); *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023); *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023); *United States v. Dubois*, 94 F.4th 1284, 1290-93 (11th Cir. 2024). The Supreme Court's language in *Rahimi* further supports this view. *See Rahimi*, 2024 WL 3074728, at *9 ("When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.").

Even if not directly bound by a precedential decision from the Second Circuit, however, it is clear from the facts of Mr. Montanez's case that the Second Amendment does not protect his conduct. Mr. Montanez was convicted of the felony of manslaughter. Felonies in the founding era were punishable by "a total forfeiture of either lands, or goods, or both, at the common law, and to which capital or other punishment may be superadded, according to the degree of guilt." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (citing 4 William Blackstone, Commentaries on the Laws of England *95 (Harper ed. 1854)). There is little doubt that Mr. Montanez's manslaughter conviction would be considered a "crime[] of violence" that would have constituted a felony in England at the time of the founding. *Medina*, 913 F.3d at 158. As the D.C. Circuit noted, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Id.*; *cf. Rahimi*, 2024 WL 3074728, at *10 (holding that when a stringent restriction on armament was traditionally permitted, then a lesser restriction on armament today is consistent with the Second Amendment). The right to bears arms under the Second Amendment does not extend to Mr. Montanez due to his manslaughter conviction.

But Mr. Montanez did not only possess ammunition after being convicted of manslaughter; he possessed ammunition while he was on parole for the manslaughter conviction. "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972). Parolees are not in physical custody of the state, but they remain in legal custody. *See Samson v. California*, 547 U.S. 843, 851 (2006).[2] In *Gay*, the Seventh Circuit faced a similar question about the right to bear arms for parolees. 98 F.4th at 847. Judge Easterbrook, writing for the panel, reasoned that because parolees are still in legal custody of the state, they "lack the same armament rights as free persons." *Id.* The court is persuaded by the Seventh Circuit's reasoning that the Second Amendment does not protect the right to bear arms for parolees.

For the above reasons, Mr. Montanez's motion to dismiss the indictment is DENIED.

### B.   Motion to Suppress under the Fourth Amendment

Mr. Montanez next moves to suppress the physical evidence—the single bullet—on the grounds that the failure to meet the triggering condition of the anticipatory search warrant rendered the search that uncovered the bullet unreasonable, in violation of the Fourth Amendment. (First Mot. at 4-6.)

---

[2] Though the Supreme Court in *Samson* discussed California's parole system, the conditions are similar to the general conditions imposed in New York. For instance, both systems require communication with a parole officer about changes in address and employment, restrictions on travel, and a prohibition on possessing weapons. *Compare id.* (citing Cal. Code Regs., tit. 15, § 2512 (2000)) *with* N.Y. Ad. Code. § 8003.2 (1986). New York's release conditions have been modified multiple times since 2020, though the relevant substance was unchanged for the relevant time period.

1.  Applicable Law

The Fourth Amendment requires that any search warrants are supported by probable cause and that they describe with particularity the location and intended target of the search. U.S. CONST. amend. IV. Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. Because the inquiry is fact-intensive and there is a general preference for warrant-based searches, "a reviewing court generally accords substantial deference to the finding of an issuing judicial officer that probable cause exists, limiting our inquiry to whether the officer had a substantial basis for his determination." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015). However, a court may conclude that a warrant is invalid where the "magistrate's probable-cause determination reflects an improper analysis of the totality of [the] circumstances." *Id.*

"An anticipatory warrant is a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place." *United States v. Grubbs*, 547 U.S. 90, 94 (2006). Anticipatory search warrants subject their execution to a condition precedent, otherwise referred to as a "triggering condition," that must occur prior to the execution of the search. *Id.* Valid anticipatory warrants therefore have both a geographic and a temporal component: "It must be true not only that if the triggering condition occurs there is a fair probability that contraband or evidence of a crime will be found in a particular place, but also that there is probable cause to believe the triggering condition *will occur*." *Id.* at 96-97 (emphasis in original); *see also United States v. Coffey*, No. 21-CR-00538 (JMA), 2023 WL 8891508, at *6 (E.D.N.Y. Dec. 26, 2023). "The supporting affidavit must therefore provide

the magistrate with sufficient information to evaluate both aspects of the probable-cause determination." *Coffey*, 2023 WL 8891508, at *7 (citing *Grubbs*, 547 U.S. at 97). "A triggering condition need not be set forth in the warrant itself." *United States v. Caraher*, 973 F.3d 57, 63 (2d Cir. 2020).

###### 2.   Application

Mr. Montanez challenges only that the triggering condition of the anticipatory search warrant was satisfied. The triggering condition of the warrant provided that the search was made "contingent upon an individual (who appears to be over the age of 18) who states that he or she is the intended recipient [of] the subject package or the rightful owner thereof, and upon the recipient entering into the subject location after acceptance of the package." (Second Search Warrant.) Mr. Montanez contends that the state court judge purposefully created these specific conditions because the contents of the package itself were not contraband and "[t]he issuing magistrate apparently recognized that the simple act of taking possession of the package in this case would not establish probable cause." (First Mot. at 5.)[3] According to Mr. Montanez, the imposed triggering condition "recognized that probable cause would only exist to search the home of a person who accepted the package with the knowledge that it contained firearm components." (*Id.* at 5-6.) And because Mr. Montanez did not "state that he was the owner or intended recipient" of the package, the triggering condition was not met. (*Id.* at 6.)

Mr. Montanez asks the court to narrowly interpret the search warrant on the grounds that while he accepted the package, he

---

[3] The package contained firearm components, the possession of which was not illegal in New York until February 25, 2022. N.Y. Penal Law § 265.01(9); 2021 N.Y. Sess. Laws Ch. 519 (S. 13-A) ("Scott J. Beigel unfinished receiver act"). Agents executed the search warrant on February 21, 2022.

did not state that he or she was the intended recipient of the package. However, "courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). "The resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* A narrow, technical interpretation of the triggering condition as described in the search warrant is therefore not appropriate.

To apply for an anticipatory search warrant, law enforcement must show both (1) that if a triggering condition occurs, then there is probable cause to believe that there is evidence of a crime at a particular location, and (2) that there is probable cause to believe that the triggering condition will occur. *Grubbs*, 547 U.S. at 96-97. The affidavit stated that there would be probable cause upon delivery of the package, and that there was probable cause to believe that the delivery would occur: the affiant believed that the package contained firearm components, so when the affiant delivered the package and it entered the subject location, the affiant believed that the subject location—the dwelling of a convicted felon currently on parole—would be used to store firearm components. The triggering condition in the affidavit was the delivery of the package. (*See* Second Search Warrant Application at 3 ("Therefore, I respectfully request that the Court issue a warrant . . . authorizing a search of the subject location – with the caveat that, in order for the warrant for the subject location to take effect, the subject package would need to be accepted into the subject location."); *id.* ("I believe that subject package is being used to store firearms materials and, upon delivery of the subject package, the subject location also will be used to store firearms materials").)

And contrary to Mr. Montanez's assertion that the magistrate created the particular conditions because the contents of the package were not contraband, it appears that the issuing magistrate lifted the condition almost directly from the NYPD officer's affidavit.[4] There is no indication that probable cause hinged on Mr. Montanez affirmatively stating that he was the intended recipient rather than silently accepting the package, as he affirms was the case. Rather, the triggering event for probable cause was met once he brought the package to his apartment. The acceptance of the package, in connection with facts gathered prior to the investigation, gave the officer probable cause to believe that there were firearm components in the apartment.

In *Caraher*, the Second Circuit similarly addressed a challenge an anticipatory search warrant based on a dispute over whether the triggering condition had occurred. 973 F.3d at 63. According to the defendant in that case, the triggering condition was satisfied when he logged into a website "as described in the warrant application." *Id.* When the website logo changed, the defendant

---

[4] In the search warrant application, the deponent NYPD officer swore:

> I further state that the subject package will be delivered . . . to the subject location through agents of the New York City Police Department, to an individual (who appears to be above the age of 18 years old) who states that he/she is the addressee on the subject package or the rightful owner thereof. . . . Therefore, I respectfully request that the Court issue a warrant and an order of seizure . . . authorizing a search of the subject location – with the caveat that, in order for the warrant for subject location to take effect, the subject package would need to be accepted into the subject location. (Second Search Warrant Application at 3.)

The issuing magistrate, Justice Walsh, issued a search warrant that stated:

> You are therefore commanded . . . contingent upon an individual (who appears to be over the age of 18) who states that he or she is the intended recipient . . . or the rightful owner thereof, and upon the recipient entering into the subject location after acceptance of the package; to then make an immediate search (Second Search Warrant.)

11

argued that the triggering condition had not been met. *Id.* The Second Circuit rejected this technical reading of the affidavit, saying that the triggering condition was simply logging in, and the description of the website was evidence to support the finding of probable cause. *Id.*

Mr. Montanez similarly attempts to expand the requirements of the triggering condition with an improper technical reading of the warrant. The warrant required the individual to "state" that he was the intended recipient or rightful owner of the package. Mr. Montanez did not specifically say so. But he was present at the house where the officers placed him based on their investigation and it is undisputed that he accepted the package and brought it inside his home. This is sufficient to meet the triggering condition. As in *Caraher*, the triggering condition cannot be read so narrowly so as to render the "triggering event impossible." 973 F.3d at 63. Because the triggering condition of the anticipatory search warrant was satisfied, Mr. Montanez's motion to suppress the physical evidence is DENIED.

Mr. Montanez also moves for an evidentiary hearing to resolve the factual dispute surrounding the delivery. (First Mot. at 10.) "Absent a contested issue of material fact, a defendant is not entitled to an evidentiary hearing." *United States v. Grant,* No. 06-CR-732 (DLI), 2008 WL 111169, at *1 (E.D.N.Y. Jan. 8, 2008) (citing *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)). Because the facts in dispute are not material for determining that there was probable cause, Mr. Montanez's request for an evidentiary hearing is DENIED.

### C. Motion to Suppress under the Fifth and Sixth Amendments

Finally, Mr. Montanez moves to suppress his post-arrest statements as made in violation of his Fifth and Sixth Amendment rights on the grounds that he did not voluntarily, knowingly, or

12

intelligently waive his rights after receiving a *Miranda* warning. (Second Mot. at 4-5.)

  1.  Applicable Law

A warning and a valid waiver of the Fifth and Sixth Amendment rights to remain silent and to an attorney are requisite components of an admissible statement made by the accused out of the presence of an attorney. *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *see also United States v. Plugh*, 648 F.3d 118, 127 (2d. Cir. 2011) (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). To safeguard these rights, *Miranda* requires that an individual taken into custody:

> [M]ust be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. 384 U.S. at 479.

While an individual may waive these rights, the waiver must be made "voluntarily, knowingly and intelligently." *Id.* at 444; *see also Berghuis*, 560 U.S. at 383 ("The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel.") It is the Government's burden to prove, by a preponderance of evidence, that the defendant "knowingly and intelligently waived his privilege against self-incrimination and his right to [counsel]." *Miranda*, 384 U.S. at 475.

A waiver is valid if the "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Waiver is voluntary if "it was the product of a free

and deliberate choice rather than intimidation, coercion or deception." *Id.*; *see also Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Signing a waiver is "strong proof" of voluntariness. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Waiver may also be implicit, based on the accused's conduct. *See id.* This is a holistic determination that must be made "on the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* at 374-75. A statement is less likely to be voluntary if law enforcement employs physical or psychological abuse to overcome the defendant's will at the time it is given. *United States v. Anderson*, 929 F.2d 96, 99 (2d. Cir. 1991). Further, evidence that shows that the accused was "threatened, tricked, or cajoled into a waiver" is indicative of involuntariness. *Miranda*, 384 U.S. at 476.

Even if the waiver is voluntary, the accused must *knowingly* waive his or her rights. That is, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. The comprehension prong often considers the defendant's capacity to understand received *Miranda* warnings. *See Berghuis*, 560 U.S. at 385-86 (considering the defendant's English comprehension, and whether officers provided him with a notice of his rights and adequate time to read the warning); *United States v. Yilmaz*, 508 F. App'x 49, 52-53 (2d Cir. 2013) (Summary Order) (considering the defendant's English comprehension); *United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997) (considering the defendant's alleged intellectual disabilities).

### 2. Application

Because Mr. Montanez signed a waiver of his *Miranda* rights and there is no indication in the record that he did not do so voluntarily and intelligently, Mr. Montanez's motion to suppress his post-arrest statements fails.

Mr. Montanez contends that the interrogating officers "did not make a good-faith effort to inform Mr. Montanez of his Fifth and Sixth Amendment rights." (Second Mot. at 5). In particular, Mr. Montanez alleges that the Government never asked whether he was willing to answer questions and failed to ensure that Defendant understood his rights and the consequences of waiving those rights. (*Id.*). However, *Miranda* and its progeny require only that prior to questioning, the accused be informed that: (1) he or she have a right to remain silent, (2) any statement that he or she makes may be used as evidence against him or her, and (3) he or she has a right to the presence of an attorney, either retained or appointed. 384 U.S. at 444-45. The defendant can then invoke his rights and cut off questioning, or else waive those rights. *See Plugh*, 648 F.3d at 125. "*Miranda* and its progeny impose no further burdens on law enforcement officers because once a defendant has been fully apprised of his rights, the law has no preference as between invocation and waiver." *Id.*; *see also Burbine*, 475 U.S. at 422 ("[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."). A suspect that reads, acknowledges, and signs a waiver of his *Miranda* rights before making a statement has knowingly and voluntarily waived his rights. *See United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). *Miranda* does not require more.

Here, the transcript and recording provided to the court shows that Special Agent Urban and Detective Rob Negron satisfied the requirements under *Miranda* when they read Mr. Montanez his rights. Prior to questioning Mr. Montanez, Special Agent Urban explicitly stated "I'm going to give you your *Miranda* rights," and then read aloud the *Miranda* warning. (Post Arrest Interview Tr. at 1-2.) Mr. Montanez then initialed and signed the waiver for

approximately ninety seconds before Special Agent Urban pro-
ceeded with the questioning. (Post Arrest Interview Tr. at 2;
Rights Waiver.) In doing so, he voluntarily waived his rights.

And at no point while initialing and signing the waiver did De-
fendant indicate that he did not understand the intended purpose
of the form's statement of rights or its waiver sections. He is a
native English speaker and can read English. (*See* Oral Argument
Transcript at 2:25-3:9, 15:3-4.) Mr. Montanez was not rushed
through signing the form, (*see* Post Arrest Interview Recording at
0:49-2:48), or otherwise coerced or intimidated. (*See* Second Re-
ply (Dkt. 28) at 1.)

Montanez's conduct further supports the idea that he understood
his right to remain silent and to counsel. After receiving his *Mi-
randa* rights, Mr. Montanez proceeded to answer the questions
of the interrogating officer. But, importantly, after answering
questions for several minutes, Mr. Montanez specifically invoked
his right to counsel, and the interrogation stopped. Mr. Mon-
tanez's ability and wherewithal to invoke his rights mid-
interrogation evidences his awareness and understanding of said
rights. Thus, the record precludes the court from concluding that
Mr. Montanez lacked a "full awareness of both the nature of the
right being abandoned and the consequences of the decision to
abandon it." *Moran*, 475 U.S. at 421.

Because Mr. Montanez voluntarily waived his right to remain si-
lent and right to counsel, his motion to suppress his post-arrest
statements is DENIED.

### III. CONCLUSION

For the foregoing reasons, Mr. Montanez's motions to dismiss the indictment and to suppress evidence are DENIED.

SO ORDERED.

Dated:     Brooklyn, New York
           July 10, 2024

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge

17